I'll call this case, Faryion Wardrip v. Lorie Davis. I'll start with Mr. Hawkins. Thank you, Judge Southwick, and may it please the Court. I will start with the State's appeal and ask the Court to reverse the conditional grant of habeas relief and render judgment for the State. I will then turn to Wardrip's pending application for a COA, and I'll ask the Court to deny that. Evidence of multiple independent and depraved murders is the most powerful aggravating evidence imaginable. In this case, the jury heard from two dozen witnesses who described in agonizing detail the five murders that Faryion Wardrip carried out over a year and a half. A forensic pathologist testified, for example, that Wardrip not only murdered Terry Sims, but raped her and tortured her to death. The details of her murder that the jury heard set out at pages 6396 and 6416 of the record are too horrifying for words. The jury heard similarly agonizing testimony as to Wardrip's four other victims. He did it again and again and again and again. It's no surprise that the outraged jury sentenced to death one of the most heinous serial killers in the history of the State of Texas. Now, in seeking habeas relief, Wardrip raises an ineffective assistance claim, claiming that the jury would have given that horrifying testimony less weight if only it had known that on his previous prison stint he took an art class and that he participated in the prison newspaper. But his claim fails on both of Strickland's prongs, and that's especially true when viewed through the unforgiving lens of EBPA deference. The easiest way to resolve this case is on the prejudice prong, and that's where I'll begin. Now, to win relief, Wardrip has to meet the strict requirements for showing prejudice, most recently articulated by this court in the Mejia case just over a year ago. Now, Mejia makes clear that anything is possible, and therefore the petitioner to prevail has to show a substantial likelihood of a different result. That is, in order to overcome the prejudice hurdle in this case, Wardrip has to tell us which witnesses would have testified, what they were going to say that was going to overcome the evidence that the State had put on, and perhaps most critically, what those witnesses were not going to say. That is, we need some assurance that the witnesses he proposes would not have been liable to give damaging testimony on cross-examination. Now, Wardrip tries to do that in the way that's set out on page 24 of his brief, and I just want to underscore how implausible the theory is that he set out in his briefing. His basic theory is that even though the jury heard horrifying, gut-wrenching testimony of torturing and raping women to death, they would have nonetheless spared him the death penalty if only they'd known that when he was in prison the first time around, he took an art class, that he participated in a prison newspaper, that he organized or participated in some sort of fundraiser. That's a textbook example of the type of speculation that Mejia just over a year ago rejected as insufficient to overcome Strickland's prejudice prong. Wardrip speculates, for example, that if only Sergeant Falkenberg had been able to testify, he would have been able to talk about this clean prison record and what Wardrip did in prison. But there's two reasons why that speculation fails the Mejia test. First, Falkenberg indicated that he didn't actually have anything positive to say about Wardrip, so it's questionable whether he would have even been willing to testify at all. Second, Falkenberg would have been liable on cross-examination to testify to things like Wardrip's reputation in prison, where he was known as having an angry temper and known as being a liar. That might have hurt Wardrip's case with the jury. The bottom line is that Wardrip has not put forward anything to support a finding under Mejia of a substantial probability of different result. Wardrip also fails on the performance prong of Strickland. Now, the Supreme Court said in Sexton quite recently that when a federal habeas court is evaluating a state court's evaluation of a lawyer's strategic decisions, it's applying what the Supreme Court called apex deference. Now, to the extent that Wardrip is attacking the state court's factual finding that Curry had a strategy, that finding is subject to 2254E1's clear and convincing evidence standard. What E1 says is that we have to presume that the state court's factual determinations are correct, and it shifts the burden to Wardrip to rebut that with clear and convincing evidence. Wardrip hasn't offered anything along those lines. We've simply got the affidavit from Curry explaining his strategy, and at best that's ambiguous as to what exactly Curry was thinking. Wardrip has no clear and convincing evidence at all. And indeed, Curry's affidavit shows that he did have a clear strategy in mind. He set out, in fact, to pursue the prison record claim to show that Wardrip had behaved himself in prison. But over the arc of the affidavit, we see Curry realize that that strategy isn't going to work because he doesn't have the facts and the witnesses to back it up. I think it's worth going in some detail through Curry's affidavit to show just how he pursued different angles in the attempt to defend Wardrip. As I mentioned a minute ago, he started out with the prison record defense, and we see him explain that at page 865 of the record. But then he changes course as he conducts an investigation. He then turns to Wardrip's family members. He says, maybe we can get something out of the family that's going to help Wardrip. So he interviewed Wardrip's sister, but she didn't want to testify in defense of Wardrip. And she says that other family members are also not going to be willing to testify based on the things that Wardrip said and did to them when he was in prison. We see in the record at page 5515, for example, Wardrip says he hates his family. And then at page 848 of the record, we see a note from Wardrip saying that he understands why his family hates him right back and doesn't want to testify in his support. So that's the data. Where was this case tried? So, Curry, it was initially set for trial in Wichita County. It was then transferred to Denton County, Your Honor. What town was it tried in? Your Honor, I don't know the town in Denton County. The record says it was transferred to Denton County. The judge signed an order transferring to that county. I don't know that the record says the name of the city it was in. It's a rural county north of Fort Worth, northwest. Denton County is north of Fort Worth and south of Wichita Falls, Your Honor, as I understand it. All right. I understand. So the next approach Curry took is let's look to Wardrip's wife. Maybe she's going to say something that will be helpful. The problem is that Wardrip himself instructed Curry not to call his wife as witness because he was worried about how she would hold up on cross-examination. So there's another dead end. Curry also hires an expert, Dr. Leon Morris, to evaluate Wardrip. But ultimately, he doesn't get anything useful out of Morris and decides not to call him because he's worried that Morris will do more harm than good by testifying to Wardrip's lies. Mr. Hawkins. Let me. I'm sorry. Go ahead. No, sir. You go ahead. I'm not hearing well. Sorry, Pat. This affidavit seems to be the affidavits we see in similar circumstances take two forms. One is sort of falling on the sword. The other is defending the work that was done. Mr. Curry is defending the work that he did in preparing for trial. It does seem to me that it is possible to read this affidavit as actually indicating somewhat cursory work in some of these areas, somewhat after the fact rationalization about why things were done and not done. How does that factor in at the difference or otherwise to our deliberations on this case? Sure, Judge Southup. Well, let me offer a few responses to that. Number one, I think that the affidavit certainly shows that Curry did enough investigation to overcome the bare constitutional minimum. I don't mean to push back on your question, but I do think as a factuality I'm not pushing back. I'm just saying there are different ways to read this, to interpret this, and our role is not usually as the initial interpreter, and I'm just wondering what all I need to be considering along those lines. Yes, Judge Southup. So to the extent it's ambiguous, that only confirms that we defer to the State Court under AEDPA. At page 7075 of the record, we've got factual findings by the State Court and legal conclusions by the State Court. What the State Court finds is that Wardrobe did investigate and did have a strategy and that as a legal matter that strategy was constitutionally adequate, satisfied the bare minimum. But he made those findings by simply adopting the State's suggestion of the findings and simultaneously actually denied evidence or hearing. So we have a trial judge sitting finding the fact after he refuses to hear evidence. Well, Your Honor, the- What's left to find if you don't have a hearing? Well, Your Honor, what's left to find I think is relevant for this court is that we have an affidavit from a lawyer saying I had a strategy and I didn't want to put on evidence of the prison record claim because that's double-edged. Now we know from this court's decision in Mejia, we know from cases like St. Alban, other cases that Mejia relies on, that it is objectively reasonable for a lawyer to forego a strategic course of action on the ground that it's double-edged. So here you've got Curry giving a correct explanation that this evidence is double-edged. What does the record tell us about Curry? It's competence. He had never tried a capital case. Is that true? Your Honor, he had not been the lead chair in a capital case before. The State court did find that his performance was competent, so that is the most important part. I understand that. I'm just trying to get a sense of it. Baldwin frames the case this way, and there are framing of it. Curry, who never handled a capital case of his own, did not strategize with anyone, did not employ a litigation expert, only visited Walter seven times, the forensic psychologist evaluated him, recommended he follow up. He declined, et cetera, et cetera. So what they're depicting is a local lawyer who has not had the experience in trying capital cases, and we know that capital cases are difficult to try. It's a challenge to prosecution and to the defense counsel itself. So that's the framing from there. Your Honor, I don't think that's a fair characterization of Mr. Curry. He was the federal public defender in Wichita County. So let me give Your Honor some record examples to show just what Curry went about doing. Much of Curry's work happened, of course, before there was even a trial. Curry was very diligent, for example, in moving to disqualify the state trial judge. We see that at page 5334 of the record. He then filed an amended motion at 5342. He conducts research along with his investigator, Ms. Rice, and we see his communications with her at page 865 of the record, for example. They depended heavily on Rice, but the assertions are that Rice had difficulties of her own and that she did not make contact with the 35 witnesses on the list that were given to him by family that would not testify. It's said that she was apparently seriously ill. What do we do with that? So, Judge Higginbotham, the record doesn't back that up. The record shows, and this is set out in Curry's affidavit, that first of all, Curry himself personally interviewed a number of the core witnesses, and as to the assertion that he's working alongside Susan Rice. Her notes from these interviews are set out in the record, and there's nothing that I'm aware of that suggests that she's just simply making up that she talked to these people. But even if I'm wrong about that, Judge Higginbotham, even if Rice was making all this stuff up, Curry himself was personally involved in the witnessing, in the interviewing of witnesses, and in researching. But the assertion is that they were still looking for witnesses during the court hour. Your Honor, the... I'm just giving you the assertion. What's the response to that? Well, so the... And that throughout the summer, months before this trial, that she was virtually not working. Well, Your Honor... And he wasn't doing any of the investigating work. Your Honor, that's simply not true. The record doesn't bear that out. It's set out in... The key record sites for this, Your Honor, are pages 6994 through 6999 of the record where Wardrop lays out, or excuse me, where Curry lays out the work that he did personally in trying to develop this strategy. So, and I've given some examples of that, Judge Higginbotham, and I can give a couple of additional examples as well. We see... Counsel, those pages you gave us, is that his affidavit? That's his affidavit. That's correct, Your Honor. All right. We also see that Curry thought through, for example, talking to the minister of the church that Wardrop joined when being released from prison. We see that at 6994, Curry ultimately decided not to call the minister because the minister was going to testify that Wardrop had lied to other parishioners about why he'd been in jail. Curry had also reached out, along with Rice, to Kenneth Bishop, who was a coworker at the Screen Door plant in Olney. But Bishop didn't know Wardrop well enough to be a helpful witness, and in any event, Bishop's testimony would have been cumulative since they were already going to call the owner of the Screen Door plant. Now, Judge Higginbotham, I think that establishes a couple of things. Number one, it establishes that Curry himself was researching mitigation strategies and approaches and witnesses, and he came up with a lot of dead ends. That doesn't mean that Curry is incompetent. It just means that Farian Wardrop is an exceedingly difficult man to defend because he's a serial killer who has somehow managed to alienate virtually everyone he's met. And insofar as his prison time, the years that he was in prison, the warden said he was one of the finest prisoners that he'd ever had. All of this, there was very little. Somebody said he was a con man, too. But nonetheless, the prison record, such as it is, discloses that he really served that time without incident. So the argument would be that the only defense this fellow would have would be that don't give him death, keep him locked up because he lives, he can survive, and no threat to anybody so long as he's in prison for witnessing what happened when he was in prison. So as I understand it, the defense counsel, Curry, said that's his defense. So, Judge Higginbotham, I think there's two reasons the Court should reject that. Number one, all of that evidence. But that was – I'm saying it was Curry. Curry asserts that that was what he was trying to defend. That was his line of attack, his strategy. Well, so, Judge Higginbotham, he starts out in the affidavit saying that he wants to focus on the prison record claim. But the affidavit spans several pages, and it's told as a narrative arc. And we see over the course of that narrative arc him saying, hey, we're going to start out with the prison record, but then realize as he goes along that it's not actually going to be borne out by the facts that he's coming up with. And so it's worth focusing on the strategy he does pursue. Number one, he calls to the witness stand the parole officer, Wardrobe's parole officer. Curry thinks that's a good strategic move for two reasons. Number one, the parole officer is one of the few people in this world who don't have anything negative to say about Wardrobe, so he's not worried about what's going to happen on cross-examination. Number two, the parole officer is able to speak to how Wardrobe performs in a very complex latticework of rules. Being on parole, the parole officer testified he could stop by any time he wanted to, check in on Wardrobe unexpectedly, and that parole officer testified that Wardrobe was one of the best parolees he'd ever encountered. So Curry's strategy here is perfectly reasonable. He says, I'm going to put on this witness who's going to testify that Wardrobe knows how to perform within the rules of a very complicated system, that being parole. The second person that he calls as a witness is the owner of the screen door plant in Olney where Wardrobe works. And that person also testifies to Wardrobe's good character and doesn't have anything negative to say on cross-examination. So anybody from the prison who Curry ends up putting on the stand and calling can testify to things like Wardrobe is a liar, can testify to the TV incident, which was the second disciplinary infraction, which is unclear from the record, but possibly actually involved an assault on another prisoner. All that would be in play if he plays up the prison record. And that's why the evidence of the prison record, Your Honor, is really a double-edged sword, and therefore it's not a problem to forego it. I think it's worth spending time on. There's really three ways why it's double-edged. Number one, it would potentially enrage the jury by reminding them that Wardrobe only served 11 years out of a 35-year sentence for murder. Number two, it shows the jury that Wardrobe is a manipulator. He knows how to work the system. He knows how to get what he wants. And number three, by emphasizing the prison record and bringing up the idea of parole, he'd be putting in the jury's minds the image of Wardrobe being a free man out on the street one day, and that makes it easier for the jury to think of him as a future danger to society if he's back in the world surrounded by 20-year-old women who he can assault. Now, it's black federal law under Mejia and St. Alban that choosing to forego that strategy is not ineffective. I'd like to just touch on a couple of different counterarguments that Wardrobe is making. Number one, he says that the state court should have held a hearing on his claims. Judge Higginbotham, we had a discussion about this a moment ago. There's no Supreme Court authority that required the state court to hold an evidentiary hearing. The decision whether or not to hold an evidentiary hearing is a legal decision, and denying it is plainly reasonable since the affidavit that was before the state court told the state court what it needed to know. Now, Wardrobe cites the Brumfield case for his proposition, but that case just says that when one side puts on zero evidence and the other side puts on a lot of evidence, you can't side with the side that put on no evidence and disregard the evidence the other side had. That's not implicated here because we've got this affidavit from Curry that's reasonable on his face. He also tries here to raise an investigator bias claim. Judge Higginbotham, you alluded to this earlier. To the extent he's trying to present the investigator bias claim, that is beyond the scope of this Court's mandate. It's time-barred by several years. It's procedurally defaulted, and it's just not borne out by the facts. We've given the record cites in our briefing that the claims made about Rice and her relationship with Wardrobe or, excuse me, her relationship with Kimbrough and Kimbrough's family is just simply not reflected in the record. Let me ask you about another procedural question, the argument that the only thing decided by the district court had to do with unreasonable determination of the facts, argument about whether we can reach unreasonable application of the law. Is that just a matter of a potential affirmance on a different ground supported by the record? Even though you wouldn't agree that it would play out that way, is that why we could consider it? Would you — isn't that an alternative reason potentially to affirm, and so it's something we could consider? Well, Judge Southwick, I want to make sure I understand your question. Our position is that there's no reason to affirm, that the district court's judgment cannot be affirmed. No, I understand, but I'm talking about whether we can reach this issue or not. And if there's an alternative reason to affirm, we could consider it and decide not to affirm or to affirm, it seems to me. So we think it's unclear from Wardrobe's papers what exactly he's arguing, but to the extent he's arguing that the district — or that the State court made an unreasonable factual determination under D-2, to prevail on that, he's got to go through 2254e-1 and show that by clearing convincing evidence that that was wrong. He can't do that. But even if he could, he still doesn't get over the AEDPA re-litigation bar set out in D-2, because he's still got to show that the State court's decision was based on that unreasonable determination of the facts. And here it wasn't at 7073 through 7075 of the record. The State court makes clear it's basing its holding on the fact that there's no prejudice. The State court says that explicitly. So he can't overcome D-2 because there's no — there's no based on. Now, to the extent he's raising a legal argument, saying that as a matter of law there was an error, then he's got to clear the D-1 hurdle, and he's got to do that, notwithstanding Apex deference set out in the Sexton case. I hope I've answered Your Honor's question. If I've misunderstood, I'm happy to answer further questions. You got close. Thank you, Your Honor. I see I've got a couple minutes remaining. With the Court's permission, I'd like to turn briefly to the pending application for a certificate of appealability, and we will ask the Court to deny that, largely for the reasons that are set out in our brief. This is related to the judicial convocate. The claim is time-barred. It's procedurally defaulted. It's outside the scope of this Court's 2011 mandate. He's raising this claim many, many years after the trial. I think there's a reason why he didn't bring it up sooner. That's because he affirmatively waived the judicial conflict claim when he pleaded guilty. Now, as I mentioned earlier, his lawyer, Curry, filed a motion to recuse or disqualify the trial judge in state court. He tried twice to do that. The Court denied those motions. Now, had Curry got or, excuse me, had Wardrop gone on to plead not guilty, that would have been potentially an issue on appeal. But when he pleaded guilty, this is at page 5430 of the record, he waived any right to challenge any non-jurisdictional defect in the proceeding prior to the entry of the guilty plea. I think that's why this claim is so untimely. It's being brought up years after the fact, perhaps because they've forgotten that it's actually an affirmatively waived. Is the first time it's injected in some form into the proceedings in the initial federal habeas in 2008, but it wasn't a specific claim? Is that where it first appears, or when is there any discussion of this issue for the first time? Well, it first comes up in state court proceedings at 5334 and 5345 in state court, and then it doesn't make its way in until he moves to file a second or successive habeas application in the Texas Court of Criminal Appeals, which gets rejected as an abuse of the writ, and then it comes in to the federal proceeding. He lost on that in the district court, and now he's asking for a COA to challenge that because he says that that would invalidate the guilty plea, so it would require changing the judgment. So he's right that he needs a COA on that,  It should be denied. We'll take the 37 seconds back. All right. Thank you, Your Honor. May it please the Court, Bruce Anton on behalf of Farron Wardrobe, the petitioner, appellant and appellee in these proceedings before the Court. As the Court's well aware at this point, this case is an outlier. The jury in this case, having heard, as the Solicitor General recounts, detailed evidence of the heinousness of the underlying offenses. Nonetheless, with little more to go on because of the limited defense that was presented, still two members of that panel initially held out against a finding of future dangerousness. The Solicitor General's argument seems to be that given the nature of the offense, that nobody would have granted relief. Yet at the inception of the deliberations, there were two jurors that were willing to do so. Had they been given any other information or had any other development of the factual basis for saying that he was not a future danger been developed, as the magistrate judge found, as the district court judge found below, there's a reasonable probability that a negative finding would have been made on the second issue, that at least one juror would have continued to hold out. That was with the positive evidences presented by Mr. Curry below. Now, this case involves and centers around the adequacy in the investigation. And honestly, reading Rompea, reading Wiggins. Well, the trial judge answered that juror's question, that it didn't really answer it, just that he basically couldn't or wouldn't and left it undefined. But I didn't hear a word from defense counsel at that point. There was no objection made? There was no objection made. Well, I mean, defense counsel may have had very good reason not to want to judge. But what do we do with that? It is an inquiry by a juror, and it happens to be an inquiry that directly focuses on about the only defense this fellow had at trial, that's my reading of the fact pattern, that persuaded the jury that this guy is a serial killer, all of those bad, terrible things that he's done, but he has flourished in the prison itself and sent him back to prison. And this is some years before we went to parole as a choice for jurors. So it's sort of an anticipation of that. And I got the sense of what the defense counsel was driving at, because that didn't make, from a trial lawyer's standpoint, it makes sense as a concept. Now, whether he can deliver on it is something else. The concept that he would spend life in prison without parole, I'm not quite sure I'm following you on, Judge Raganbotham. In other words, my defense is, ladies and gentlemen of the jury, this man did these terrible things, and he confessed to the last one that he did and served those years in prison and then came back and paroled the state of Texas, said he's a good prisoner of nothing. We put him back on the street. He married. He had a family. And now, what, 13, 14 years later, DNA picks him up. And it's a very unusual fact pattern. But nonetheless, it remains, as counsel officer points out, he's pled out to serial killing. So a juror is going to think, sure, this man's dangerous. As a defense lawyer, the only place he can go here is, yes, but given his absence of violence in prison, in the absence of violence since then, your choice should be to send him back to life. But then the question that comes from the juror is not answered. But the defense counsel never unchecks. Now, why not? I mean, or even urge the judge to say, judge, you know, try to persuade him to give him some foothold in the charge. I can't honestly speculate, Judge Higginbotham, on what his motivations were. We do know from the conduct of the trial that his entire presence before the jury was relatively de minimis. He engaged in really no cross-examination, extensive cross-examinations of any witness. He put on two brief witnesses at the punishment phase, and the length of his entire closing argument at the punishment phase of the death penalty case is probably less time than I will spend arguing before you this afternoon. He made very, I think, one of the reasons that appellate counsel below had little to work with on appeal is that there was little objection made to anything that he did. If he had a strategy, it's not apparent from the record in that regard. But what I'm suggesting to you is perhaps counsel thought that he feared what would happen if the judge amplified and answered the question, given the circumstance that at the time the instructions would be given to a jury that you're not to consider the terms of parole, blah, blah, blah, whatever, which can be, we know pretty powerfully from the data, that the effect of that all turned to the jury, so it's been a sharp decline, at least parallel to the decline in the terms of death sentences. Well, I think, Judging Bob, this goes to the... I don't know if I'm making myself clear in the line of questioning. This goes to, I think, the underlying fundamental contradictions in what trial counsel's post hoc rationalizations by his trial strategy were. On the one hand, he says, I don't want to alert the jury of parole. But the entire prison case is based upon showing that he spent a little over a decade in prison and then was paroled, and then he doesn't want to make parole an issue before the jury for their consideration. Yet one of the only two witnesses he calls is his parole officer. So far from trying to bury the concept of parole or hide it from the jury, it appears that that was the emphasis of his case to the extent that it involved any evidence that he put on. But then also, part and parcel of that, his decision is, I didn't want to show that he was a changed man, but good conduct in prison and good conduct on parole after prison... He was a changed man. I think that Mr. Curry's affidavit quite clearly says that he couldn't sell that. But the reason we're here is because that decision does not pass muster under RAMPIA or Wiggins. I thought he said that because what he was saying, but that leads you to the only argument that he really had, which is he's not a changed man, but he's not going to hurt anybody in prison. Yeah. His argument was that he had established a track record of being able to conform his conduct in that institution such that he would not represent a future dangerous society. Right. Now, counsel, let me ask you on the same point. Just looking at the state habeas findings of fact, which you don't accept, but I do think they need to be unreasonable under the EPA standard, the state habeas court found that the trial court, that trial counsel did investigate, they quote at great length, as you know better than I, the affidavit that Curry came up with as to how he dealt with this, whether he was reformed or not. He was concerned that if he went that road, that the idea that Waldrop was a con artist, a liar, would get in front of the jury as some sort of rebuttal or cross-examination, and that the evidence of his good prison record introduced by the state was before the jury. Now, that may not be the best way or even a particularly good way to do it. I'm not saying one way or the other, but it does seem to me, looking at this through the lens of whether the state habeas court went off the rails, which is not official legal terminology, but their findings cannot be upheld under our deference that we have to give them, or double deferential treatment, both to what the state trial court held, the habeas court held, confirmed by the court of criminal appeals, as well as the double deference, as well as to Waldrop's attorney itself. I mean, how do you attack, I mean, your briefing does, but articulated here, why isn't that the hurdle that you, how do you get over that hurdle? Well, Your Honor, I think as the court is well aware in many death penalty issues, there's always a double-edged sword. I don't want to conflate the obligation to investigate with the decision to use information that was developed during the investigation. The decision, for example, to say I don't want to call him at this point because an inmate will say he's a liar can be a reasoned strategy only if that testimony has been investigated and balanced and trial counsel has weighed it against the plethora of other information to make that determination. And what we have here in this case is the state, the Solicitor General arguing and Mr. Curry asserting, well, I decided I'm not going to use that. He made that determination that it was a two-edged sword without knowing what else was out there that would balance the scales. That kind of investigation, I mean, his entire case, Judge Salford, is based upon the prison records, and yet he did not investigate the prison records. His affidavit refers to the fact that basically it was a favorable circumstance that the state introduced those prison records for him. The burden in state court under 11071 is for the applicant to allege that there are facts that, if true, would merit relief, which was done, and Mr. Schrant, habeas counsel below, detailed factors from the prison records that should have been presented. In light of that, Mr. Curry introduced an affidavit, and he does not address any of those factors. As a matter of fact, he just simply says, I was aware of his prison record. But the prison record introduced at trial was simply the judgment and sentences, the fingerprint sheets, and the two disciplinary reports that the state chose to include in the prison packet and nothing else. And the affidavit does not show any awareness on the part of Mr. Curry that he had knowledge of any of the other circumstances that Mr. Schrant pointed out below. What's the most prejudicial omission that you're focusing on? That's what I'm struggling with here, is at the end of the day, what is the information that would have swayed this jury? I don't think there's one particular piece of information, but I think the sum total of several factors would show that. One, he took, I think, the extraordinary step of helping to try to do a fundraiser for a child in the community. I think that he bettered himself through classes and work in the unit, that in 11 years in a penal institution in the state of Texas, he had only two minor disciplinary problems. That was introduced to the jury. To be clear, don't we expect prisoners to behave in prison? We absolutely, Judge Hogan, do expect prisoners to behave in prison. That may be a decent point. It's hardly a compelling, devastating point. I think that you respectfully must measure his conduct in the prison versus what is ordinarily seen in the prison system. And I believe that the indications are that Mr. The burden is on you to demonstrate that this was such powerful evidence, that its omission was clearly prejudicial to the death sentence. So you've got to have some sort of smoking gun here. The jury on this case, knowing nothing else about Mr. Wardrop's time in prison except that he spent a little more than a decade in prison and only had two disciplinary issues, two of them initially felt that that was the state had failed in proving that they had established a future danger. And as the magistrate judge found below, and we listed, set out in our brief and set out in his findings, he listed a litany of other conduct from Mr. Wardrop in prison that felt that, as the judge found below, that these additional circumstances probably would or there's a likelihood that they would have compelled a juror to maintain that he was not a future danger. And we said, I can list those, a quote from the magistrate's findings below. But we feel that it's a circumstance as far as his prison conduct that if two people already have determined that they have a doubt about his future dangers, that that additional information would have been enough to make the difference. And I do think that some of the things that he did in the prison system, such as fundraising, were kind of extraordinary, very uncommon circumstances that a juror could take into account. The opposing counsel alluded to the fact that one of the, I guess, two minor incidents may or may not have involved assaults. Do you know anything about that? There was a, my recollection is that there was one instance in which there was a dispute over changing the channel on a television set and that a fight broke out and that Mr. Wardrop was one of the people that was punished in that. So just a shoving match in the day room over the TV channel control. What was Mr. Kerr's argument to the jury? His argument to the jury was very brief, and it essentially was, this is a very difficult case because the underlying facts are heinous, but what we have here is a person who has spent ten years in prison without incident, and that establishes that he may be able to conform his behavior to a society, and based on that fact, we would ask that you find that he is not a continuing danger to society. Thank you. You assert that the prison warden made this comment about him, that he was one of the fondest prisoners he had had in those years and so forth. What's the record of reference to that? That is from the parole officer. That's not from the prison official. That was the parole officer, I believe, that testified at the punishment phase. Did he testify to that with the jury or not? Yes, he did. That he was a model parolee, I think, is the testimony that the judge made. I don't know what the warden said about him, who testified to that. The warden, Judge Faulkenberg, gave an affidavit to our investigator in which he detailed the good works that Mr. Wardrip had done while he was in prison. I don't know that he said that he was – I don't know that those kind of – I don't recall that that kind of superlative was used. That's obviously a very powerful statement in favor of a client. Yes. That the jury heard. From the parole officer? Right. Yes, that he was a good parolee, yes. Or the best ever in his experience. Why does that – yet the jury nevertheless felt comfortable issuing its sentence, undoubtedly based on other considerations. I think the issue before the court is, given what they had before, was there anything additional that could have swayed them? And as the magistrate judge found below, there's a constellation of circumstances from the prison days. I guess what I'm wondering is if you've got this statement, you know, and that wasn't enough, it seems to me that the omission that you're talking about here is cumulative evidence at best. I would disagree that it's cumulative. I think that when you have a jury on a death penalty case, and this jury was apparently diligent enough to want to consider all the facts and circumstances, that when you have a jury that's willing to consider that his 10 years in prison alone raises sufficient doubt as to answer the special issue number two, that any supplemental facts that you can add to it to show not only that Mr. Wardrop had served, there's a difference between – and let me answer the question this way. I think there's a difference between going to prison and not working, staying in your cell, going to prison and contributing in some way, and going to prison and taking positive steps to improve yourself. And I think that the record that was – I see the distinction you're drawing, and it's a fair one. I guess my question, though, is if the jury has already heard that he was a great parolee and that wasn't convincing to the jury, why do you feel that additionally hearing that he was also a great prisoner would have swayed the jury? Because the burden on the prejudice prong is clearly on you, right? In terms of his conduct in the prison, what the jury would have heard, it's true that the jury heard that he had 10 years without incident, but they didn't hear how much he had improved himself. And it's good that while he was out on parole, he was a model parolee. But I think in terms of is he a future danger and sentencing him to prison, how he's going to do in prison, I do think that there's a difference that would have been persuasive to the jury other than simply saying he went to prison and he didn't cause any problems versus he did these additional – he took these additional steps and took these additional actions, which show that he's improved himself. But, counsel, as I read his affidavit, he said – or his testimony – he said, I felt that whatever good things he might have accomplished in prison were not really relevant to the argument I was trying to make. I don't understand that statement by him. Can you give me some context for that? It doesn't make sense. Well, I think there – first of all, before I digress for a moment, I disagree with the Solicitor General's opinion that this affidavit is an arc. It's not an arc. It's an uncontextual recitation in no particular order of what he did. But when he says, I was aware of Mr. Wardrop's conduct in prison, that has to be taken in the context that Mr. Schrant in the 11071 said Mr. Curry was not aware of these circumstances. He did not list the factors we talked about, about the fundraising and good conduct in prison. And Mr. Curry, so when he says, well, I was aware of his good conduct, you notice that the trial court below on the state level, when they said good conduct, put the word good. You're saying that when he said that his good record in prison wasn't relevant to his argument, the predicate of that, that he had not learned what his record was. That is precisely our point as regards to all of the witnesses that we – that were presented at the federal level, but also at Mr. Schrant and Crawford at the state level. If you read very carefully Mr. Curry's affidavit, the Solicitor General makes it sound as though Mr. Curry had conducted investigations and made decisions based upon what he learned not to call people. But he didn't – if you read the affidavit carefully, he didn't talk to Mr. Wardrop's family. He said he was told by his sister that they may not be willing to help, although that may change. What could be a bigger red flag in terms of further investigation than reaching out to your client's family and say, let's hear what good things they have to say about him. But he foreclosed further investigation simply because he believed that the family would be hostile. He talks about the fact that he expected there would be – anticipated there would be hostility in the community, but he doesn't say that he investigated or went out in the community to talk to anybody. He just foreclosed an investigation, that additional testimony, because he felt that it probably wouldn't be – it wouldn't be fruitful to him. But he knew that the investigator's wife had a relationship – a longtime family relationship with the family of one of his victims? The investigator that was part of the office, Dana Rice, approached Mr. Curry after he'd been appointed on the case and disclosed to him that she had had a relationship with some of the victim's family members. And she felt – apparently she felt strongly enough about it to bring it to Mr. Curry's attention that that was the case, and yet he engaged no other investigator. As the record – and this is the record in the district court. This is not the record in the state court below. But what was developed in the district court, we know, is that she was bipolar. She was on lithium. She missed a month for a hysterectomy. That she was given a list of witnesses to contact about approximately a month before jury selection was to start. And by the middle of September, while jury selection had already commenced, had not contacted most of them. We have the questionnaires where the contact information was simply to reach out to the witness and then say, I got no response, or they didn't answer the phone. So that – it's inconceivable to me under Wiggins and Rampea that that kind of investigation can be characterized as adequate in any sense of the word. As Justice O'Connor said in Rampea, in Wiggins, it's not just – you don't make these determinations just upon what you knew, but you also have to look at what was available to you and what should have raised red flags and what you should have followed up on. If your entire case to the jury is based upon the prison records, it's inconceivable to me that you wouldn't go get the prison records to see what else was in there. It's inconceivable to me that you would rule out entire classes of information by saying it could be a two-edged sword when you haven't talked to anybody to know which side of the blade is sharper, if it's going to cut worse or if it's going to help. The public defender in that county is funded by the county government? Yes, Judge Higginbotham. He was the public defender of Wichita Falls, which is approximately the same size community as Denton, where this case was tried. Denton is, you know, the home of North Texas University. It's a community of several hundred thousand people. The town is noted as the hometown of, I think, a population of about 20. I know the geography pretty well from going to a lot of Texas maps. It's about 2,300 people. Olney? Is that close? I believe the community, the bedroom community was from the Wichita Falls area, Olney. It's a much smaller rural community, yes. My impression is, and correct me if I'm in error, but this whole saga is drawn from a small community. Several of the murders took place in a small community. Well, you've got the judge who handled the divorce for a number of people, and, you know, et cetera, et cetera. But that's what you expect in a small town, because you don't have those kinds of relationships, and everybody got both of them. Certainly, relative to the Metroplex and Dallas area, the bar up there is smaller, and I assume that the number of people involved in death penalty litigation that undertake pointed capital murder cases in Wichita Falls is a small community, and so it's probably not a coincidence that Judge Brotherton, if he's practicing law, would have the opportunity to be appointed to represent somebody. And in the smaller community, certain that many of the practitioners don't exclusively engage in criminal law or exclusively engage in civil proceedings, but have a mixed practice, and that's not surprising either. And, yes, what's particularly troubling about Dana Rice, the investigation that was done, is that because it was a small community and she knew these people, that was also more likely to be predicted, but certainly I would think that the investigator would feel more pressure from the local town folk, if there's a limited number of them, about her involvement in the case than if she'd come from a much larger pool. And I think we can't be certain of how much that played upon her investigation of the case, but we know this. Her investigation was totally inadequate. I mean, that was, by any standard, to have an investigator in a capital murder case do basically nothing until after jury selection has commenced is unfathomable. In jury selection, the trial counsel is supposed to be putting out their legal theories to the jury, talking about what their plans are in presenting the case and looking for the right kind of juror. Is this a juror that's going to be persuaded by the future dangers in this issue? Is this a juror that's going to be persuaded by mitigation? And not to have made those decisions based on evidence until after you're in the middle of jury selection gainsays any notion of a strategy. When Mr. Curry, in his affidavit, says that he knew that Mr. Wardrobe had lied and that based on that lie he didn't think that he would call him as a changed man, I want the court to understand that he learned that after jury selection in the middle of September when the mediation tapes were reviewed by him for the first time. So in other words, going into jury selection, that was not a decision he made. And what's more remarkable about the investigation is he was appointed in February, and by his own admission he didn't start contacting people for several months because he wanted the situation to simmer down and felt that if he contacted people too soon it would be fresh in their minds and not let it go. So for approximately six months of the investigation, there was a determined strategy not to reach out to people for three months of that. Our position on this case is that, as I think set out in ROMPIA, is that counsel has a duty, the minimal requirement for effective assistance, is that if you think that before you can determine that you're not going to use a certain type of evidence, you at least have to go seek it out and review it. Then you can make the decision to present it or not. But in this case, none of that information was sought out, and for that reason we believe that he should be granted a new trial. Thank you. All right, counsel. Thank you. Mr. Hawkins. Thank you, Judge Southwick. Just a few points. I think my friend on the other side just demonstrated that the easiest way to resolve this case is on the prejudice prong of Strickland. His presentation was focused almost entirely on the performance prong. All he said about prejudice was in response to Judge Ho's question about what his best case for prejudice was, and his response to that was to say nothing other than the prison fundraiser that Wardrop was involved with. I just want to underscore how implausible that is, and I urge the Court to look at the trial transcript, pages 6396 of the record, page 6416 of the record. This is graphic testimony that the jury heard about how exactly Terry Sims was orally raped, vaginally raped, and literally tortured to death. The jury heard testimony that Wardrop severed a major artery and punctured both of her lungs such that she lay in a pool of her own blood, dying to death, or dying over the bleeding and suffocating to death over the course of several minutes. And counsel is now suggesting that the jury would have put that aside if only it had known about a fundraiser, about a prison newspaper, about the other things that Wardrop did in prison. It's just simply not plausible. Well, Mr. Hawkins, the whole jury didn't have to be convinced, just one or two holdouts. That's correct, Judge Southwick, but this is – but Edputt – what Edputt does when viewed through the lens of Strickland is it places the burden on Wardrop to show a substantial probability in light of the evidence that the jury heard. There's no basis for finding a substantial probability that even one juror would have reached a different result in light of the horrifying testimony that the State put on. And it wasn't just Terry Sims, Judge Southwick. It was four other women suffered this fate, and the jury heard about all of it over and over. Isn't there some evidence, though, that two jurors along the way were not convinced? Your Honor, Mejia addresses that just over a year ago and says anything is possible. And we agree. Anything is possible. But that's not a basis for granting habeas relief. Is it possible that one juror might have been swayed by that? Well, I don't mean – I suppose in a theoretical sense. I don't mean speculation, but did the juror note and whatever else is in this record is more than speculation. Well, so the juror – the juror note about whether we're talking about time in prison or outside of prison, Judge Higginbotham was asking about the Court's response to that, and I think it's worth stressing Texas law on this point. It's all right for a jury to think about the future dangerousness inquiry without impermissibly considering the possibility of parole. I'd like to cite two cases to the Court for that proposition, both from the CCA. There's a case called Matchett v. State, 941 Southwest 2nd at 939. That's a 1996 decision of the CCA. There's a case called Estrada v. State. That's 313 Southwest 3rd at 281. And what those cases say is that for the future dangerousness inquiry, whether a defendant would create a continuing threat whether in or out of prison without regard to how long the defendant would actually spend in prison if sentenced to life is something that the jury can take into account. And I think that's why Judge Higginbotham, the judge in this case, gave the response that he did. It's because he knows that the jury can think about a world in which wardrobe is back on the street, whether it's through a prison break or something else. At the end of the day, the jury heard that he was an ideal parolee. That's correct, Judge Ho. So the idea that they didn't hear that he was, I guess, arguably an ideal prison inmate, that's the missing ingredient according to counsel. Correct, Judge Ho, and I think there's no reason, there's no basis to overcome the hurdle that Mejia throws in wardrobe's way on that point. If anything, it would be more compelling that he was an ideal parolee because he's outside of the coercive environment of the prison. That's why it's more compelling then that he's an ideal prison inmate when he essentially is in a very coercive environment. I think that's correct, Judge Ho, and I think Curry certainly thought about that, and that's why he focused on the parole officer, because the parole officer was one of the only witnesses he talked to who didn't have something negative to say about wardrobe. And Judge Higginbotham, if he called somebody to talk more about the prison records, somebody from prison, he'd be opening himself up to bad testimony that would harm wardrobe, in particular the video of wardrobe lying to the parents of Tina Kimbrough, saying he'd never harmed anybody else before. That's something that was concerning. Judge Ho, you asked about the potential assault in the second infraction. Curry thought it was an assault. It's page 6504 of the record describing what happened in that incident. I see I'm effectively out of time. Unless the Court has any further questions, we would ask to reverse and render judgment for the State on our appeal and deny the COA. Thank you. Thank you both for your arguments today, which were very helpful and excellent briefing preceding that. It's now our turn to give you a decision. Thank you, Your Honor. You are adjourned.